# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |  |
|---|---|---|---|
| TINA M. KOPPERS, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 12 CV 3993 | |
| v. | ) | | |
| | ) | Honorable Michael T. Mason | |
| CAROLYN W. COLVIN, Acting | ) | | |
| Commissioner of Social Security,[1] | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Tina Koppers ("Koppers" or "claimant") brings this motion for summary judgment [19] seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner"). The Commissioner denied Koppers' claim for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner's response asks that this Court uphold the decision of the Administrative Law Judge ("ALJ") [27]. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Koppers' motion for summary judgment [19] is granted in part and denied in part, and the case is remanded for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Koppers first filed for DIB on July 27, 2006, alleging disability since October 17, 2004. (R. 191-92, 188-90.) Koppers' date last insured is June 30, 2010. (R. 12.) The Social Security Administration first denied her claim on November 16, 2006, and then again upon reconsideration on April 25, 2007. (R. 70, 71.) Koppers filed a timely

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

request for a hearing, which was granted, and she had her first hearing, in front of ALJ John Pope, on April 1, 2008. (R. 734-73.) ALJ Pope issued a decision on September 15, 2008 denying Koppers' claim for benefits. (R. 72-81.) Koppers filed a timely request for appeal and, on July 1, 2009, the Appeals Council remanded the case to ALJ Karen Sayon for further proceedings, including an evaluation of Koppers' obesity, credibility, and treating physician's opinion. (R. 83-86.)

ALJ Sayon held Koppers' second hearing on February 10, 2011. (R. 26-69.) On February 16, 2011, ALJ Sayon denied Koppers' claim for DIB. (R. 10-20.) On April 5, 2012, the Appeals Council denied Koppers' request for review (R. 1-3), and Koppers filed a timely appeal to this Court [1]. The parties have consented to our jurisdiction pursuant to 28 U.S.C. § 636(c) [6].

## II.    FACTUAL BACKGROUND

### A.    Medical Evidence

#### 1.    History of Medical Complaints

As of her alleged onset date (October 17, 2004), Koppers was 50 years old. Koppers alleges disability due to degenerative disc disease, cervical radiculopathy, glaucoma, pseudo-tumor cerebri, ocular hypertension, kidney stones, atrial fibrillation, migraines, obesity, sleep apnea, and arthritis. We discuss below the medical evidence for each of these conditions pertinent to the issues before us.

With respect to her degenerative disc disease ("DDD") in her lower back, a MRI taken of Koppers' lumbar spine on October 1, 2004 showed "severe changes of [DDD] at L5-S1, with disk space narrowing and severe end-plate degenerative signal changes [sic]." (R. 397.) A December 13, 2005 MRI of the lumbar spine again showed DDD with

narrowing at L5-S1, along with sclerosis at the articular surfaces. (R. 392.) On December 21, 2005, Koppers met with Howard Robinson, MD, of the Chicago Institute of Neurosurgery and Neuroresearch, for a "routine physiatric follow up ... for significant low back pain." (R. 441-42.) Dr. Robinson reported Koppers was "easily able to go from a sitting to a standing position," her "lumbar range of motion is significantly limited in all planes," and she demonstrated "excellent range of motion of her bilateral hips." (R. 441, 442.) Dr. Robinson's "impression" was "significant low back pain and bilateral leg pain most likely related to her severe degeneration at the L5-S1 level with severe disc space narrowing and Modic changes." (R. 442.) He recommended bilateral S1 transforaminal epidural steroid injections as "she has tried multiple courses of physical therapy in the past with no benefit." (*Id.*)

A MRI of Koppers' lumbar spine from April 5, 2007 showed "advanced" DDD at the L5-S1 level, a "very mild posterior disc bulge at L4-L5, and "moderate" narrowing of the neuroforamina bilaterally at the L5-S1 level. (R. 597.) A July 22, 2009 MRI indicated that at the L4-L5 level, "there is diffuse disc bulge, that with facet hypertrophy causes very mild central canal and mild left and mild to moderate right neuroforaminal stenosis," and that this "is similar as compared to 2007." (R. 665.) That MRI also showed a "diffuse disc bulge and a bilateral neuroforaminal disc protrusion" at the L5-S1 level that "is similar to slightly increased as compared to the prior exam." (*Id.*)

With respect to cervical radiculopathy, an x-ray taken September 9, 2004 revealed "no significant" findings (R. 455), and an MRI of Koppers' cervical spine taken on April 5, 2007 was unremarkable. (R. 537.) However, a November 3, 2010 EMG revealed evidence of mild chronic left-sided C7 root nerve involvement, which confirmed

a left-sided C7 radiculopathy.  (R. 700.)  The EMG and subsequent assessment by Phyllis Bonamino, MD, of the Bone and Joint Physicians, indicated Koppers experienced low back pain and numbness in her left foot consistent with the C7 radiculopathy.  (R. 700, 717.)  Following a December 21, 2010 exam, Dr. Bonamino wrote Koppers had cervical pain with left-sided C7 impingement and again indicated low back pain with numbness in her feet consistent with radiculopathy.  (R. 697.)

With respect to Koppers' claims of visual difficulties, the earliest record on vision issues indicates Thomas Mizen, MD, of Rush-Presbyterian-St. Luke's Medical Center, first evaluated Koppers on April 5, 2005.  (R. 412.)  He concluded that Koppers had an anomalous optic nerve, ocular hypertension, and controlled ocular pressures.  (*Id.*)  At that same visit, Koppers complained to Dr. Mizen that her prescription Xalatan was causing her "significant" bone and muscle pain.  (*Id.*)  Dr. Mizen noted that according to the drug's website, muscular pain "is a rare side effect."  (*Id.*)  During a March 9, 2006 examination, Koppers demonstrated corrected visual acuity of 20/40 and Dr. Mizen assessed her as "stable in the presence of an anomalous optic nerve."  (R. 413.) Records from Ingalls Memorial Hospital on March 30, 2006 state that Koppers had "anomalous optic nerves and ocular hypertension."  (R. 467.)  Dr. Mizen wrote that Koppers had a "stable optic nerve anomaly and controlled ocular tensions" on September 26, 2006.  (R. 549.)  On August 14, 2007, Dr. Mizen again noted Koppers had ocular hypertension, and on February 24, 2008, he similarly concluded Koppers had "stable ocular tension in the presence of an anomalous optic nerve." (R. 606, 605.) His impressions remained the same during her visits on March 8, 2009, August 26, 2009, and February 27, 2010.  (R. 633-35.)

With respect to kidney stones, Koppers claims that some of those stones were side effects of Diamox, a medication she was prescribed and taking for her glaucoma and ocular hypertension. (R. 404.) Ultrasounds performed on August 10, 2007, November 29, 2007, January 22, 2010, and March 10, 2010, indicated the presence of kidney stones, and the January 2010 ultrasound showed stones in both kidneys. (R. (611, 614, 726, 707.)

The parties do not dispute that claimant has also been diagnosed with supraventricular tachycardia and atrial fibrillation in the past. However, a Holt Monitor test taken on July 7, 2005 showed no supraventricular tachycardia, no atrial fibrillation, and that Koppers' palpitations and shortness of breath were likely correlated to her normal sinus rhythm. (R. 375.) A myocardial perfusion study from that same date was negative and indicated no fixed or reversible perfusion defects. (R. 378.) A portable view of the chest taken on March 29, 2006 demonstrated no acute infiltrate or effusion. (R. 472.) An echocardiogram taken March 31, 2006 was unremarkable. (R. 374.)

As discussed in further detail below, Koppers testified at both her first and second hearings that she suffers from severe headaches. (R. 744, 752-53; R. 47-48, 54.) It does not appear that she complained of headaches at visits with Dr. Mizen subsequent to her alleged onset date. (*E.g.*, R. 632-65.) Nor does the record indicate that Koppers had any testing or studies done related to headaches or migraines.

With respect to obesity, at the April 1, 2008 hearing, Koppers stood 5'7" tall and weighed 230 pounds. (R. 742.) At the hearing on February 11, 2011, Koppers stood 5'7" tall and weighed 254 pounds. (R. 33.) As for apnea, a sleep study performed on July 31, 2009 states Koppers had "at least a mild case of sleep apnea." (R. 656.)

Another sleep study performed August 27, 2009 noted that "the severity of the sleep apnea" previously diagnosed "may have been underestimated on the study, with the lack of supine REM sleep." (R. 654.)

Finally, as for claimant's assertions of numbness in her hands and feet, along with arthritis, an April 5, 2007 record from Ingalls Memorial Hospital indicates that Koppers complained of "bilateral arm numbness." (R. 537.) However, a MRI taken that day revealed a "normal" cervical spine. (*Id.*) X-rays taken at Ingalls Memorial Hospital on July 1, 2010, when Koppers evidently complained of hand pain, showed "[m]ild bilateral osteoarthritic change," with a 0.2 cm subchondral cyst on the fourth finger and "mild joint space narrowing" on her left hand. (R. 671.) They also showed a possible 0.2 cm rounded density at the base of her middle finger, but no narrowing of the interphalangeal joints, on her right hand. (*Id.*) According to Dr. Bonaminio's notes from a November 23, 2010 appointment, Koppers reported "numbness in her left hand, which is new and also has bilateral foot numbness [sic]." (R. 700.) Dr. Bonaminio also noted Koppers' "history of multiple joint complaints," reviewed an EMG dated November 3, 2010, noting "[m]ild chronic left C7 root nerve involvement, and included, among her "assessment[s]," that Koppers had "[l]ow back pain with radiculopathy with numbness in her left foot." (*Id.*) During another examination by Dr. Bonaminio on December 21, 2010, that doctor again "assessed" that Koppers had, among other things, "[l]ow back pain with radiculopathy with numbness in the feet" and "[b]ilateral hand pain with elevated sedimentation rate." (R. 697.)

### 2.    Medical Source Opinions

At the request of Illinois' Disability Determination Services, Koppers had a

consultative examination with Stanley Rabinowitz, MD, on October 11, 2006.  (R. 497-500.)  His October 12, 2006 report reflects that, in addition to speaking with and examining Koppers, he reviewed reports by Dr. Mizen and Dr. Robinson, progress records from Ingalls Memorial, a lumbar spine x-ray, a lumbar spine MRI, an echocardiogram and a pulmonary function test.  (R. 497.)  He observed that Koppers has a history of glaucoma, has developed multiple kidney stones connected with her prescription Diamox, a history of atrial fibrillation, a history of pseudo-tumor cerebri and significant chronic lower back and cervical spine pain.  (*Id.*)  Dr. Rabinowitz's concluded from his physical examination of Koppers that "[r]ange of motion testing of all the joints and spine is within normal limits."  (R. 499.)  He found "no evidence of active joint inflammation, joint deformity, instability, contracture or paravertebral muscle spasm."  (*Id.*)  Koppers had 20/40 vision in both eyes without glasses.  (R. 498.)  Dr. Rabinowitz found that Koppers "walks normally without the help of any assistive device," and tested 5/5 on her motor strength involving the upper and lower extremities bilaterally, which represented "normal motor strength" in those areas.  (R. 499, 500.)  Dr. Rabinowitz detected distinct heart sounds, and found that Koppers' heart was not enlarged and had no murmurs, thrills, heaves, or rubs.  (R. 499.)

Virgilio Pilapil, MD, a state medical consultant, completed a physical residual function capacity ("RFC") assessment of Koppers on October 24, 2006.  (R. 515-22.)  He noted a "primary diagnosis" of DDD and a secondary diagnosis of "Pseudo Tumor."  (R. 515.)  He also noted Koppers' glaucoma and her "history of kidney stone since 2002 [sic]."  (R. 522.)  After reviewing various scan records and Dr. Rabinowitz' report, Dr. Pilapil found that Koppers had various exertional limitations: she could occasionally lift

and/or carry 50 pounds and could frequently lift and/or carry 25 pounds; could stand and/or walk with normal breaks for about six hours in an eight-hour workday; could sit with normal breaks for about six hours in an eight-hour workday; and had no push and/or pull limitations other than those for lifting and carrying.  (R. 516.)  Dr. Pilapil found that Koppers had no postural, manipulative, visual, communicative, or environmental limitations.  (R. 517-19.)  Finally, he wrote that Koppers' condition as he described it "is consistent with the exertional limits related to DDD."  (R. 522.)  On April 24, 2007, Robert Patey, MD, a state medical consultant, reviewed "all of the evidence in file" and "affirmed" Dr. Pilapil's October 2006 RFC "as written."  (R. 563-65.)

Koppers' treating physician, Alexander Kmicikewycz, MD, completed a "medical source statement of ability to do work-related activities (physical)" on February 13, 2008.  (R. 569-71.)  He opined that Koppers could occasionally lift and/or carry 10 pounds and could frequently lift and/or carry no more than 5 pounds.  (R. 569.)  He also concluded that Koppers could stand and/or walk with normal breaks less than two hours in an eight-hour workday and that she could sit with normal breaks for less than six hours in an eight-hour workday.  (R. 569, 570.)  He found that Koppers had several postural limitations such that she should never climb, balance, kneel, crouch, or crawl. (R. 570.)  He also concluded Koppers had manipulative limitations and could only reach occasionally and handle frequently.  (R. 571.)

### B.    Claimant's Hearing Testimony

Koppers has a high school education.  (R. 742.)  Beginning in 1985, Koppers held a variety of jobs at a home improvement store.  (R. 244.)  That store was acquired by Hechinger Investment Company in 1997, and Koppers continued to work there as a

returns clerk into 1998.  (R. 251.)  In June of 1998, Koppers became the human resources ("HR") administrator at Hechinger.  (R. 253.)  In June of 1999, Koppers left Hechinger to work as an intake coordinator at HealthSouth Corporation, a physical therapy office, which was her last job prior to her alleged onset date.  (R. 255.)

At her first hearing in April 2008, claimant testified, among other things, that she sees an urologist about every six months because of kidney stones.  (R. 747.)  She stated that she has had twelve procedures for 17 kidney stones, most recently in 2006.  (R. 760.)  She testified that she gets headaches, specifically in the back left and right side of her head.  (R. 744, 752.)  She also stated that she experiences these headaches roughly five times per month, and the pain can last all day.  (R. 753.)  Claimant also testified to having numbness in both her right and left legs.  (R. 745.)  She stated that she is prescribed several medications, including Xalatan for her eye problems.  (R. 748.)  Koppers testified that one of Xalatan's side effects is hip pain.  (R. 758.)  She reported that her medications make her very tired all the time.  (R. 749.)   Claimant testified that at that time, she could probably lift 10 pounds, could walk for an hour and a half total over an eight hour period, could stand for two hours total over an eight hour period, and could sit for four hours total over an eight hour period.  (R. 753-54.)

At the time of her second hearing in February 2011, Koppers was 57 years old, and had not worked since October 2004, when she was an intake coordinator at HealthSouth.  (R. 33, 34.)  When asked why she has been unable to work since October 2004, claimant testified that she has a pinched nerve in her back, that she cannot sit for long periods of time "because both of [her] legs go numb," that she also has a pinched nerve in the left side of her neck, so her left arm "goes completely numb,"

9

and that she has arthritis in five of her fingers. (R. 39.) With respect to her back, Koppers stated that she can sit for only about ten minutes at one time before needing to change positions, that this condition has gotten worse over time, and that in 2004, she could sit about a half an hour before she would have to stand up. (R. 39-40.) On a scale of 1 to 10, Koppers rated her then-current back pain at a 9, and at a 7 in 2004. (R. 40.) As for the pinched nerve in her neck, Koppers stated that it had long been a problem, but had gotten worse in the last couple of years. (R. 40-41.) She testified that her left arm had been going numb every day for two or three years. (R. 41.) As for her arthritis, Koppers testified she had had it in her hands for about three or four years, identified the three fingers on her right hand as being arthritic, but did not remember which fingers had the issue on her left. (R. 41.)

As for standing, Koppers testified she could then stand for a couple of minutes at one time, and that that limitation has worsened since 2004, when she said she could stand for "maybe ten minutes" at a time. (R. 43.) She testified she could then walk about 75 feet, compared to "probably a block" in 2004. (*Id.*) Koppers estimated that she could lift five pounds, compared to about 10 or 20 pounds in 2004. (R. 43-44.)

Koppers also testified regarding her recurring kidney stones at the 2011 hearing. She stated that she has had 17 kidney stones removed over her lifetime, and that 12 of them had been removed in the last five years. (R. 47, 50.) She testified that if she goes in to have a stone removed, the stent incapacitates her for ten days afterward, and then she has to strain her urine for four to six weeks to ensure the stone broke up. (R. 50-51.) She testified that the stent causes a lot of pain, as well as a constant feeling that she has to go to the bathroom. (R. 51.) She affirmatively answered her attorney's

question that, since she had had 12 kidney stones in the last five years, "for at least 48 weeks in those five years," she would not have been able to work on the basis of kidney stones alone. (*Id.*)

Regarding headaches, Koppers testified that in 2004, she got a bad headache at least a couple of days a week. (R. 47-48.) However, as of the time of the hearing, she reported that she has headaches all day every day "from the pinched nerve," and that once or twice a week she gets a particularly bad headache on her right side that lasts all day, during which she cannot function. (R. 47-48, 54.) However, Koppers testified that she never missed work during her last year of work because she worked for a physical therapist who would give her therapy. (R. 54.)

### C.    Vocational Expert's Hearing Testimony

Edward Pagella, a vocational expert ("VE"), testified at claimant's second hearing. (R. 59-67.) He testified that Koppers "performed a wide variety of occupations," and that her job as an HR administrator was a skilled occupation at the sedentary level of physical tolerance per the Dictionary of Occupational Titles ("DOT"), but that according to her testimony, she performed it at the medium level of physical tolerance. (R. 61.) He also testified that Koppers' last job, as an intake coordinator at HealthSouth, was classified as a semi-skilled occupation at the sedentary level, but Koppers also performed that job at a medium level per her testimony. (*Id.*)

VE Pagella testified that if a hypothetical individual of Koppers' age, education, and work history were limited to a range of light work (standing and walking about six out of eight hours in a workday, lifting and carrying up to 20 pounds occasionally and ten pounds frequently, with only occasional stooping, crouching, kneeling, crawling, and

balancing), she would be able to perform Koppers' past work as HR administrator, intake coordinator, cashiering supervisor, and inventory clerk, as those jobs are normally performed in the national economy (at a light level). (R. 61-62.) The ALJ then asked the VE to consider that same hypothetical person with a sit/stand option. The VE testified that she would still be capable of the HR administrator and intake coordinator positions as normally performed, but the other two positions would be unavailable because they involve standing throughout the workday. (R. 62.) Further, he testified that other jobs at a light level (but unskilled in nature) would be available, such as hand packer (4,700 positions within the Chicago metropolitan region), hand assembler (5,600 positions), and hand sorter (2,800 positions). (R. 64-65.)

When limited to sedentary work, the VE testified that the hypothetical individual would still be able to perform the HR administrator and intake coordinator positions. (R. 63.) However, after adding restrictions of the need to nap for two hours per day, or daily headaches and concentration problems that would render the individual off-task 30 percent of the time, or the missing of more than 21 days in the course of a calendar year to deal with a medical condition, the VE stated that no work would be available. (R. 63-64.) The VE also noted that per the DOT, no jobs in the sedentary environment would permit limitations such as occasional handling and fingering. (R. 65-66.)

Koppers' attorney asked VE Pagella to assume a hypothetical individual who could lift ten pounds occasionally, could lift less than ten pounds frequently, could stand or walk less than two hours in an eight hour workday, could sit less than six hours in an eight hour workday, is limited to pushing and pulling, and could only occasionally reach and "can only frequently handling [sic]." (R. 67.) The VE responded that such an

individual is at a less than sedentary level of physical tolerance, as they would not be working an eight hour day, so there would be no work available. (*Id.*)

### III. LEGAL ANALYSIS

#### A. Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation and quotations omitted). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quo*ting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539. While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion,"

*Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.     Analysis Under the Social Security Act**

To qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Sayon followed this five-step analysis. At step one, she found that Koppers has not engaged in substantial gainful activity during the period from her alleged onset

date ("AOD") of October 17, 2004 through her date last insured ("DLI") of June 30, 2010.  (R. 12.)  At step two, the ALJ found that claimant had the following severe impairments through her DLI: pseudo-tumor cerebri, lumbar degenerative disc disease, migraines, obesity, recurring kidney stones, ocular hypertension, sleep apnea, atrial fibrillation, and cervical radiculopathy.  (*Id.*)  At step three, the ALJ found that Koppers' impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  (R. 12-13.)  At step four, the ALJ determined that Koppers had the RFC to perform sedentary work, except that she could engage in "only occasional stooping, kneeling, crawling, balancing, and crouching," and that "[t]he work should have a sit/stand option that allows the claimant to change positions every forty-five minutes for five minutes at a time."  (R. 13.)  The ALJ then determined that Koppers was capable of performing her past work as a HR administrator and intake coordinator, "as these jobs were normally performed."  (R. 19.) Accordingly, ALJ Sayon concluded that Koppers was not under a disability as defined under the Act at any time during between her AOD and her DLI.  (*Id.*)

Claimant argues before this Court that, for a variety of reasons, the ALJ improperly assessed her credibility as well as her RFC.  We address those issues as appropriate below.

### C.    The ALJ Erred in Evaluating Koppers' Credibility

Because the ALJ is in a superior position to judge credibility, her credibility determination is entitled to "special deference."  *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (citation omitted).  However, the ALJ is still required to articulate her reasoning and discuss or distinguish relevant contrary evidence.  *Clifford*, 227 F.3d at

870.  Additionally, the ALJ must follow the requirements of Social Security Ruling ("SSR") 96-7p.  Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms of the underlying impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  We find that the ALJ failed to properly evaluate claimant's credibility for the following reasons.

First, the ALJ's rejection of several pieces of evidence favorable to Koppers based on illogical or erroneous statements, and failure to address other favorable evidence, fatally undermine her credibility analysis.  Even if evidence exists in the record to support an ALJ's decision, we cannot uphold it where the rationale offered does not satisfy the ALJ's obligation to build an accurate and logical bridge between the evidence and the result.  *Sherwood v. Astrue*, No. 11-8968, 2012 WL 5966539, at *19 (N.D. Ill. Nov. 28, 2012) (*citing Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).  And as noted above, an ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected."  *Indoranto*, 374 F.3d at 474.

Here, the ALJ dismissed Koppers' complaints of muscle pain, particularly in her hips, because "X-rays showed no significant findings and she displayed full range of motion on consultative examination."  (R. 18.)  However, it is not obvious how an x-ray would establish the existence (or lack thereof) of a muscular condition, and the ALJ failed to explain that rationalization.  Further, the ALJ does not explain how an x-ray taken in 2004, or an examination done in 2005, rules out the possibility that Koppers' complaints in 2005 to Dr. Mizen (who noted that Xalatan's website states that hip and

low back pain are side effects of the drug) and in 2011 at the hearing might be credible. And the ALJ's failure altogether to confront the evidence in Dr. Mizen's report on this issue further warrants remand. *Indoranto*, 374 F.3d at 474.

As another reason for finding claimant's allegations of disabling impairments not credible, the ALJ cited Koppers' testimony that she never missed work during her last year of employment. (R. 18.) However, Koppers testified that the reason why she never missed any work during her last year was because she worked at a physical therapy office, and one of the physical therapists would give her therapy for her headaches while she was at work. (R. 54.) The ALJ's failure to discuss that evidence further undercuts the reliability of her credibility determination. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (holding an ALJ may not selectively discuss evidence).

The ALJ's discussion of Koppers' history of recurring kidney stones also fails to pass muster. In the portion of her opinion reviewing Koppers' medical history, the ALJ describes several ultrasounds showing the presence of kidney stones. (R. 14.) She concluded that discussion by stating: "Overall, I have considered the claimant's recurring kidney stones in evaluating her [RFC]." (*Id.*) However, when discussing her credibility determination, after describing claimant's testimony regarding how she cannot work for four to six weeks at a time following placement of a stent and removal of a stone, the ALJ wrote that "this is not documented in the medical evidence." (R. 17.) In so stating, the ALJ relied first on ALJ Pope's prior conclusion that this impairment was non-severe, and noted that claimant's brief to the Appeals Council cited only a limited number of pages in the file. (*Id.*) We fail to comprehend how the opinion of an ALJ that has been reversed, or a claimant's citations in a prior brief, qualify as evidence

undercutting claimant's credibility regarding symptom severity, particularly where the ALJ has already acknowledged other related evidence elsewhere in her opinion. *See* SSR 96-7p, 1996 WL 374186, at *2 (the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record).

Further, while the ALJ discounted certain record references to hospitalization and treatment as having occurred before Koppers' AOD, she referenced the March 2010 stone, but failed to articulate why it did not support Koppers' claims. (R.17.) The ALJ also improperly ignored a January 2010 ultrasound that demonstrated the presence of stones in both right and left kidneys. (R. 726.) *Indoranto*, 374 F.3d at 474.

Additionally, the ALJ relied on what she evidently perceived to be a contradiction in Koppers' testimony: "Interestingly, while the claimant testified that these kidney stones incapacitated her for four to six weeks, she also said that she never missed any time from work the last year she was employed." (R. 17.) However, any such contradiction could rest only on a misapprehension of the record. Koppers' last day of employment was in October 2004. (R. 255.) She does not allege that she had any kidney stones in the year prior to that date, *i.e.*, October 2003 through October 2004. The ALJ erred by failing to account for the facts that would reconcile the supposed contradiction. *Groskreutz v. Barnhart*, 108 Fed. Appx. 412, 416 (7th Cir. Aug. 26, 2004) ("[W]e will reverse when an ALJ's decision 'is unreliable because of serious mistakes or omissions.'") (*quoting Sarchet*, 78 F.3d at 308).

Second, the ALJ erred in her consideration of evidence regarding certain side effects of claimant's medications. The ALJ must consider the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken."

SSR 96-7p, 1996 WL 374186, at *3. The ALJ disregarded Koppers' testimony that her medications caused, among other things, dizziness, upset stomach, tiredness, and poor concentration, because "she did not report these extensive limitations to her treating physicians." (R. 18.) However, SSR 96-7p prohibits an ALJ from "draw[ing] any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide," 1996 WL 374186, at *7, something the ALJ failed to do here. Further, the Seventh Circuit has expressed "skeptic[ism] that a claimant's failure to identify side effects undermines her credibility – after all, not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects." *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009). And alternative medications without such side effects may not currently exist. But the ALJ did not confront those issues either. As a result, we find that the ALJ's finding that Koppers lacked credibility on this issue lacks proper support. *Sellers v. Astrue*, No. 10-7951, 2012 WL 280714, at *8 (N.D. Ill. Jan. 31, 2012) (remanding where ALJ failed to adequately explain why claimant's failure to complain of extreme drowsiness to his doctors rendered his drowsiness complaints incredible).

Finally, we agree that ALJ Sayon used boilerplate language strongly discouraged by the Seventh Circuit when writing that she discredited Koppers' testimony regarding her symptoms "to the extent they are inconsistent with the above [RFC] assessment." *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). However, use of this boilerplate does not, standing alone, independently warrant remand. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). In any event, we anticipate that the ALJ will avoid

putting that "cart before the horse" on remand.

### D.    The ALJ Erred in Assessing Claimant's RFC

A claimant's RFC is the most a claimant can still do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  In assessing the RFC, the ALJ must consider all of the relevant evidence in the case record, including information about symptoms that might not be shown by objective medical evidence alone.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).  A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review."  *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).  "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence."  *Id.* at 592.

The ALJ here concluded that, through her DLI, Koppers had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) except only occasional stooping, kneeling, crawling, balancing, and crouching.  The work should have a sit/stand option that allows the claimant to change positions every forty-five minutes for five minutes at a time."  (R. 13; *see also* R. 19.)  That determination is faulty for at least two reasons.[2]

First, ALJ Sayon failed to adequately explain her reasoning for not giving "controlling or great weight" to the opinion of claimant's treating physician, Dr. Kmicikewycz.  (R. 19.)  Dr. Kmicikewycz opined that Koppers could occasionally lift and/or carry 10 pounds, and could frequently lift and/or carry no more than 5 pounds.

---

[2] We note that the ALJ's failure to properly evaluate Koppers' credibility also impacts her RFC determination.  On remand, the ALJ should properly address, as appropriate, the evidence discussed above, as well as that discussed below, in the context of Koppers' RFC.

(R. 569.)  He also concluded that Koppers could stand and/or walk with normal breaks less than two hours in an eight-hour workday, and that she could sit with normal breaks for less than six hours in an eight-hour workday.  (R. 569, 570.)  As for postural limitations, he found that Koppers could never climb, balance, kneel, crouch, or crawl (R. 570), and concluded that she had manipulative limitations and could only reach occasionally and handle frequently.  (R. 571.)

Generally, an ALJ will give the opinion of a treating physician controlling weight because treating physicians are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition.  20 C.F.R. § 404.1527(c)(2).  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion.  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)).  The ALJ must always give "good reasons" for her determination as to the amount of weight given.  20 C.F.R. § 404.1527(c)(2).

In not assigning "controlling or great weight" to Dr. Kmicikewycz's opinion, the ALJ first wrote that the doctor's "treatment notes mainly just refills the claimant's prescriptions [sic]."  (R. 19.)  In so concluding, the ALJ improperly failed to address the facts that Dr. Kmicikewycz had been Koppers' physician for over twenty years (R. 745), that Koppers had visited him roughly three times a year since her AOD, and that his notes appear to be equally comprised of comments regarding Koppers' "progress" and

her test results.  (*E.g.*, R. 745, 577-603, 675-93.)[3]

The ALJ also faulted Dr. Kmicikewycz's opinion because it "provided very little explanation" and "instead just checked the boxes he deemed appropriate."  (R. 19.)  But "[a]lthough by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records."  *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).  Indeed, the Seventh Circuit has recently noted the utility of a claimant's treating physician "lay[ing] out in plain language exactly what it is that the claimant's condition prevents her from doing."  *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011).  Further, the substantive format of Dr. Kmicikewycz's opinion is no different from those of the state's consulting physicians (R. 515-22), yet the ALJ failed to explain why she held that format against Dr. Kmicikewycz but still gave "some weight" to the consultants' opinions.  (R. 18-19.)

As for the ALJ's reason that Dr. Kmicikewycz's opinion was inconsistent with Koppers' testimony at the first hearing, the ALJ compared Dr. Kmicikewycz's opinion that Koppers can "stand and/or walk" for less than two hours total during an eight-hour workday to Koppers' testimony that she should walk for one and a half hours during an eight-hour workday, and stand for two hours during an eight-hour workday.  (R. 19.)  However, it is unclear from the sequence of the ALJ's questions and Koppers' answers whether Koppers was describing her standing and walking abilities during a single eight-

---

[3] The ALJ also noted that Dr. Kmicikewycz "did discuss some of the claimant's subjective complaints, but findings on examination were generally with normal limits [sic]."  (R. 19.)  As support, the ALJ cites generally to two exhibits that comprise nearly fifty pages of doctors' notes.  (*Id.*)  Even if evidence exists in the record to support an ALJ's decision, such a broad reference does not satisfy the ALJ's duty to build an accurate and logical bridge between the evidence and the result.  *Sherwood*, 2012 WL 5966539, at *19 (*citing Clifford*, 227 F.3d at 871).  This is particularly true where the ALJ failed to address, in the context of that doctor's report, the record evidence that arguably supported his conclusions.  (*E.g.*, R. 397, 597, 665, 671, 697.)

hour period, or two such periods.  The ALJ's failure to clarify that issue precludes us from determining whether her comparison of that testimony with the physician's opinion is appropriately "apples to apples."

The second error in the ALJ's RFC determination involves some of the specific limitations she imposed.  Although it is a responsibility of the ALJ, as a finder of fact, not a physician, to determine a claimant's RFC, the ALJ must consider both medical and nonmedical evidence in the record.  *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) (*citing* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2), & 404.1545).  ALJs are not permitted to construct a "middle ground" RFC without a proper medical basis.  *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 2006).  Put another way, when an ALJ denies benefits, "she is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record."  *Suide v. Astrue,* 371 Fed. Appx. 684, 690 (7th Cir. 2010) (citations omitted).

Here, the ALJ appears to have engaged in just this sort of prohibited analysis.  When evaluating the medical source opinions, the ALJ first wrote she gave "some weight to the opinions of the State agency physicians" (R. 18), who opined that Koppers was fit for medium exertional work and had no postural limitations.  (R. 515-22, 563-65.)  Notably, she did not specify what amount of weight she gave those opinions.  She then went on to write that "in viewing the evidence in a light most favorable to the claimant, I find additional limitations," including sedentary work with mild postural limitations of occasional stooping, kneeling, crawling, balancing, and crouching.  (R. 18, 13, 19.)  However, she failed to specify what evidence supported those "additional limitations."  Instead, she went on to list her reasons for rejecting the more stringent limitations

proposed by Koppers' treating physician. (R. 18-19.)

For those reasons, the ALJ's RFC assessment is deficient and warrants remand. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."); *Bailey*, 473 F. Supp. 2d at 838-39 (remanding where ALJ rejected all medical opinions in the record and imposed specific lift/carry/push/pull limitations consistent with light work without citing supporting record evidence); *Norris*, 776 F. Supp. 2d at 637 ("ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis."); *Briscoe ex. rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("The ALJ did not explain how he arrived at these [stand/sit and environmental] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").[4]

As for the other arguments raised by Koppers, we note as follows. Koppers has not cited any authority establishing that the ALJ erred by failing to consider a later AOD to accommodate certain evidence of hand and arm pain or numbness that arose after her DLI. We fail to understand how the decision in *Motley v. Astrue*, No. 07-3489, Apr. 8, 2009 Report & Recommendation [17], applies here, not least because Koppers did not argue before the ALJ that an alternative onset date ought to be considered. However, because we are ordering remand, we direct the ALJ to clarify her reasoning on the issue, paying particular attention to the time frame described in Koppers' testimony (R. 39, 40), as well as whether the July 1, 2010 x-ray might reflect a condition

---

[4] While the ALJ wrote that "[o]verall, I have considered the claimant's recurring kidney stones in evaluating her residual functional capacity" (R. 14), her opinion does not describe how the RFC limitations she imposed flow from this – or any other – particular impairment.

arising before her June 30, 2010 DLI.  (R. 671.)

As for Koppers' final, single sentence request that we "direct the Commissioner to have the evidence evaluated by a physician," given our ruling regarding the ALJ's RFC determination, as well as the timing of the state consultants' opinions (a limitation the ALJ herself seems to have recognized (R. 18)), such an evaluation may indeed be advisable.  *See Bailey*, 473 F. Supp. 2d at 842 (requiring ALJ who rejected the available medical record on which to base her RFC assessment to call a medical advisor on remand).  Consistent with the other aspects of our opinion, we anticipate the ALJ will consider the need for such additional evidence and obtain it if appropriate on remand.[5]

## IV.   CONCLUSION

For the reasons set forth above, Koppers' motion for summary judgment [19] is granted in part and denied in part.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: August 28, 2013

---

[5]  Given our decision to remand, we need not wade into the parties' arguments as to whether the ALJ misunderstood, or merely misquoted, the July 2009 MRI.  (*Compare* Pl.'s Br. at 14 [20], Pl.'s Reply at 4-5 [28], *with* Df.'s Br. at n.2 [27].)  On remand, we trust the ALJ will take additional care when reviewing this evidence.